STATE ex rel. William TRIMBLE, et al., Relators,

v.

The Hon. Brendan RYAN, Judge of the Circuit Court, City of St. Louis, Missouri, Respondent.

No. 69376.

Supreme Court of Missouri, En Banc.

Feb. 17, 1988.

Stuart Oelbaum, St. Louis, for relators.

Ronald B. Wessel, Steven G. Schumaier, Clayton, for respondent.

### ORIGINAL PROCEEDING IN PROHIBITION

RENDLEN, Judge.

Relators seek to prohibit enforcement of respondent's order striking the ad damnum clause from their wrongful death petition and restricting their claim against defendant Bi–State Development Agency (Bi–State) to $100,000.00.

In their petition for damages, relators, the parents and wife of decedent James Trimble, alleged that on September 21, 1986, Trimble sustained fatal injuries when riding in a car that collided with a Bi–State bus operated by James McKenney, an employee of Bi–State. Further, they alleged

the collision resulted from the bus driver's negligence when attempting a left turn into a Bi–State lot in the City of St. Louis, and prayed judgment against Bi–State and the bus driver, jointly and severally, in the amount of $3,000,000. Defendants responded with their combined motion to dismiss and strike portions of plaintiffs' petition, asserting *inter alia* that Bi–State's tort liability as a political subdivision of the State of Missouri is limited to the amount specified in sec. 537.610.2, RSMo 1986. The court denied defendants' motion to dismiss, but as noted above struck the ad damnum clause of plaintiffs' petition, who, after an unsuccessful effort for prohibition in the Court of Appeals—Eastern District,[1] were granted our provisional rule which is now quashed.

The applicability of sec. 537.610.2 to Bi–State is a question of first impression and one requiring examination of Missouri's sovereign immunity doctrine. Following the judicial abrogation of sovereign immunity by this Court in *Jones v. State Highway Commission*, 557 S.W.2d 225 (Mo. banc 1977), the legislature enacted secs. 537.600, et seq., RSMo 1978, reinstating "[s]uch sovereign or governmental tort immunity as existed at common law prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date" and except for specified instances in which immunity was expressly waived by the new statute. "Since its reinstatement, sovereign immunity has been the rule for all public entities unless a certain prescribed exception is applicable." *State ex rel. New Liberty Hospital District v. Pratt*, 687 S.W.2d 184, 186 (Mo. banc 1985).

█ The first issue is whether Bi–State is a public entity which would have been immune from tort liability prior to *Jones*. Under the common law, "municipalities were not protected by sovereign immunity for torts arising from their proprietary functions but were protected from ...

---

1. Claims of sovereign immunity have jurisdictional aspects and so may be properly the subject of prohibition. *State ex rel. St. Louis Hous-*

*ing Authority v. Gaertner*, 695 S.W.2d 460, 462 (Mo. banc 1985).

torts arising from their governmental functions. This distinction was not applicable to the state and its political subdivisions which were fully protected under the immunity doctrine for their tortious acts." *McConnell v. St. Louis County*, 655 S.W.2d 654, 656 (Mo.App.1983); *see also Wood v. County of Jackson*, 463 S.W.2d 834 (Mo.1971). The term "municipality" has a narrow meaning in the context of sovereign immunity, "because the words and structure of sec. 537.600 indicate the legislature's intent to reenact sovereign immunity as the rule with only limited exceptions[.]" *State ex rel. St. Louis Housing Authority v. Gaertner*, 695 S.W.2d 460, 463 (Mo. banc 1985). Indeed, such diverse entities as municipal housing authorities [*St. Louis Housing Authority*, 695 S.W.2d at 463], hospital districts [*New Liberty Hospital District*, 687 S.W.2d at 184], special road districts [*Lamar v. Bolivar Special Road District*, 201 S.W. 890 (Mo.1918)], sewer districts [*Page v. St. Louis Sewer District*, 377 S.W.2d 348 (Mo.1964)] and counties [*Wood*, 463 S.W.2d at 835] have been held to be political subdivisions of the state rather than municipal corporations when sovereign immunity issues are involved.

The history and nature of Bi–State must be considered against this background. Bi–State was created in 1949 by a compact between the States of Missouri and Illinois contained in secs. 70.370 et seq., RSMo 1986. The district created encompasses the City of St. Louis and the Counties of St. Louis, St. Charles, and Jefferson in Missouri as well as the Illinois Counties of Madison, St. Clair, and Monroe. Section 70.370 provides that Bi–State "shall be a body corporate and politic" and specifies its powers, among which are: (1) planning, constructing, owning, operating and maintaining bridges, airports, and terminals; (2) making plans for the "coordination of streets, highways, parking areas, terminals, water supply and sewage and disposal works, recreational and conservation facili-

ties and projects, land use pattern and other matters in which joint or coordinated action of the communities within the areas will be generally beneficial"; (3) charging and collecting fees; (4) issuing bonds; (5) receiving contributions and appropriations from local, state, and federal governments; (6) disbursing funds for its activities; (7) performing "all other necessary and incidental functions"; and (8) exercising "such additional powers as shall be conferred on it by the legislature of either state concurred in by the legislature of the other or by act of congress." There are ten Bi–State Commissioners, five of whom are from Missouri and appointed by the governor with the advice and consent of the senate. It is also worth noting that Bi–State was "assigned" to the Missouri Department of Transportation under sec. 226.007, RSMo 1987.

The term "public entity" is not defined in sec. 537.600 et seq.; however, an examination of sec. 70.370 and the nature and history of Bi–State leads to the inescapable conclusion that it is a public entity with substantial governmental authority and power, and that, like special road and sewer districts, it is not a municipality. To hold otherwise would distort the plain meaning of the term "public entity."[2] While not binding upon us, it is significant that Illinois courts have interpreted the term "public entity" as used in that state's sovereign immunity statute to include Bi–State. *Grady v. Bi–State Development Agency*, 151 Ill.App.3d 748, 104 Ill.Dec. 427, 502 N.E.2d 1087 (1986). We are not unmindful of powerful policy arguments favoring application of the governmental/proprietary distinction to *all* political entities asserting sovereign immunity. However, as previously noted, prior to *Jones* that analysis was applied only in the limited instances where municipalities were involved, and the legislature has expressed its intention that that distinction remain in effect. It is the

---

**2.** We note that some confusion has been generated by casual use of the terms "political subdivision" and "public entity." *See Counts v. Morrison–Knudsen, Inc.*, 663 S.W.2d 357, 361 n. 2 (Mo.App.1983). Section 537.600 refers to "public entities," while sec. 537.610.2 uses the phrase

"the state and its public entities," and although "public entities" may in some contexts encompass more than "political subdivisions," *see Counts, id.*, the distinction, if any, between the terms is irrelevant to the issues confronting us here.

legislature's prerogative to express the policy of the state within the constitutional framework by statutory enactment and when so expressed it is not the function of the courts to declare otherwise.

The principal authority cited by relators in support of their contention that Bi–State is not a public entity is *St. Louis Transit Co. v. Division of Employment Security,* 456 S.W.2d 334 (Mo.1970), in which this Court concluded that Bi–State was not a political subdivision of the state for purposes of determining whether this Court has jurisdiction of actions involving Bi–State under article V, section 3 of the Constitution of Missouri. The jurisdictional questions presented in that case involved considerations quite separate from the questions of immunity presented here, and *St. Louis Transit* is not persuasive authority for the proposition that Bi–State is never, in any context, a political subdivision of the state. Certain other public entities that have not been considered political subdivisions for purposes of appellate jurisdiction have nevertheless been found to possess sovereign immunity. *See, e.g., Page,* 377 S.W.2d at 348 (sewer district); *Hill–Behan Lumber Co. v. State Highway Commission,* 347 Mo. 671, 148 S.W.2d 499 (Mo. 1964) (Highway Commission).

■ Having concluded that Bi–State is immune from tort liability under common law concepts existing prior to September 12, 1977, we note that, accepting the averments of the petition as true, Bi–State is nonetheless amenable to suit under the statutory waiver of immunity contained in sec. 537.600.1(2), pertaining to injuries "directly resulting from the negligent acts or omissions by public employees arising out of the operation of motor vehicles or motorized vehicles within the course of their employment[.]" However, sec. 537.610.2 provides that:

> The liability of the state and its public entities on claims within the scope of sections 537.600 to 537.650 shall not exceed eight hundred thousand dollars for all claims arising out of a single accident or occurrence and shall not exceed one hundred thousand dollars for any one person in a single accident or occurrence, except for those claims governed by the provisions of the Missouri worker's compensation law, chapter 287, RSMo.

In light of the plain language of the statute, it cannot be seriously disputed that relators' claim is one within the scope of sec. 537.600.1(2), and, therefore, one to which the claim limitation applies. The trial court did not exceed its jurisdiction in limiting relators' recovery against Bi–State to $100,000.

■ Finally, we address relators' contention that the trial court exceeded its jurisdiction in limiting recovery against the bus driver to $100,000. We do not interpret the order as having that effect, but to avoid confusion we direct that it be modified so that the damage award limitation clearly applies only to Bi–State. The bus driver here is not protected by "official immunity," which precludes tort claims arising from discretionary acts or functions of public officials engaged in the performance of their official duties. *Johnson v. Carthell,* 631 S.W.2d 923, 927 (Mo.App.1982). This driver, like the driver in *Johnson,* was not a public official performing a discretionary act, but rather was engaged in the ministerial matter of navigating a left turn.

For the reasons stated, we quash our provisional rule in prohibition except to direct modification of the trial court's order so that it limits recovery as to Bi–State only.

BILLINGS, C.J., and DONNELLY, WELLIVER, ROBERTSON and HIGGINS, JJ., concur.

BLACKMAR, J., dissents in separate opinion filed.

BLACKMAR, Judge, dissenting.

The legislature, in adopting § 537.600, RSMo 1986, to reverse the holding in *Jones v. State Highway Commission,* 557 S.W.2d 225 (Mo. banc 1977), gave the courts no guidance as to the scope of sovereign immunity and made no attempt to extend the concept, but simply directed us to apply the doctrine as it existed on September 12, 1977, subject to the exceptions specified in

the statute. We must determine, therefore, whether Bi–State Development Agency, in its surface transportation activities, enjoyed sovereign immunity prior to September 12, 1977.

One circumstance which hits us squarely between the eyes is that, in at least 15 cases decided on appeal prior to the effective date of § 537.600, Bi–State was the defendant in a personal injury suit arising out of its bus operations. Bi–State began bus operations in 1963. *St. Louis Transit Company v. Division of Employment Security*, 456 S.W.2d 334, 335 (Mo.1970). The first appeal of a damage suit seems to be *Coulter v. Bi–State Development Agency*, 434 S.W.2d 793 (Mo.App.1968). In no reported case was there even a suggestion of the possibility of sovereign immunity. It is patent, also, that many more suits must have been disposed of in the trial court, and many claims were settled without litigation.

On June 15, 1978, this Court handed down opinions in *Myers v. Bi–State Development Agency*, 567 S.W.2d 638 (Mo. banc 1978) and *Nagel v. Bi–State Development Agency*, 567 S.W.2d 644 (Mo. banc 1978) affirming plaintiffs' verdicts in suits against Bi–State. These cases come after *Jones*, but before the effective date of § 537.600. By the express terms of *Jones*, such sovereign immunity as Bi–State enjoyed would still be applicable because of postponement of the effect of the *Jones* rule until August 15, 1978. It is no answer to say that the question was never raised.[1] The material inquiry for us is the state of the law as of September 12, 1977, and the general understanding at the time the legislature considered § 537.600 at its 1978 session. The legislature necessarily is aware of the prevailing legal climate.

A holding that Bi–State is liable in tort and does not enjoy sovereign immunity is consistent with legal principles then prevailing. The law of municipal corporations has long recognized a distinction between "governmental" operations, to which sovereign immunity applies, and proprietary operations, to which it does not. *Beiser v. Parkway School District*, 589 S.W.2d 277 (Mo. banc 1979), expounding the familiar rule. The proprietary operations, generally, are those of a kind regularly carried on by private enterprise.[2] The sense of the law is that the substitution of a public provider for a private one should not operate to the disadvantage of tort claimants.

Surface transportation, manifestly, is an activity appropriate to private business. Those injured by buses or trolley cars have traditionally had a remedy in damages. *See Rider v. Julian*, 365 Mo. 313, 282 S.W.2d 484 (1955). It was apparently assumed on all sides that the transfer of surface transportation operations in the greater St. Louis area from the prior operators to Bi–State did not deprive injured members of the public of the common law remedies previously available. Neither the agency nor its counsel apparently considered that it was immune. It must have built this assumption of liability into its forecasts and projections.

Cases such as *Beiser v. Parkway School District, supra,* holding that states, counties, and other governmental units are immune from liability even though their activities may be of a proprietary nature, do not control. These units historically have carried on functions which are governmental, and their assumption of operations of a proprietary nature is a relatively recent phenomenon, coming after established doctrines of immunity had been developed in the case law. Bi–State, by contrast, was a new animal. The courts were perfectly free to determine the nature of the beast and to decide on the basis of prevailing legal doctrine whether its operations should be the subject of sovereign immunity.

The case of *St. Louis Transit Company v. Division of Employment Security*, 456 S.W.2d 334 (Mo.1970), is of much more

---

**1.** Query whether the Court may be a party to the unauthorized award of funds of a public agency simply because the point of immunity is not raised by counsel.

**2.** *See Davis v. City of St. Louis,* 612 S.W.2d 812 (Mo.App.1981)—street sweeper.

assistance than the principal opinion suggests. I agree that it does not rule the question of sovereign immunity directly. What it shows, however, is that we recognized that Bi–State was a new kind of agency, not readily fitted into existing concepts such as "political subdivision." Inasmuch as its bus operations are distinctly proprietary, a holding that it had no sovereign immunity would be entirely in line with prevailing caselaw. Its operations were confined to urban areas and the well established law applicable to proprietary operations of municipal corporations is appropriate. The *St. Louis Transit* opinion states in so many words that Bi–State does not perform "governmental functions."

I am confident that, had the point been argued prior to 1977, our courts would not have found Bi–State to be immune, by analogy to proprietary functions of municipal corporations. This is especially so because a holding of immunity would preclude any recovery whatsoever, in any amount. The allowance of a claim with limits of $100,000 per person and $800,000 came only in 1978, as a matter of legislative grace, in § 537.610.

Section 537.600 commands us not to extend the law of sovereign immunity. What it says is that any future modifications, or consideration of inequities or irrationalities, must come from the legislature and not from the courts. The legislature, however, has not given us any guidance as to the liability status of Bi–State, either before or after 1978. We are not forbidden to decide explicitly a question which seems to have been implicitly decided over a period of many years prior to 1977. That question should be decided on the basis of common law principles as understood in 1977 and the climate prevailing in the legal and governmental community at the time.

In *Jones* we postponed the effective date of abolition of sovereign immunity because of the expectation of the governmental units involved that they were not liable for tort damage. The legislature passed § 537.600 because of that same expectation. Bi–State's expectations, however, were distinctly to the contrary. It fully expected that it would be liable for personal injury damage. The principal opinion gives Bi–State a bonanza it had no reason to expect.

The principal opinion apparently considers that our basic task is to determine whether Bi–State is a "public entity." This approach is purely conceptualistic. The phrase, "public entity" is not a term of art. It was introduced to this area of jurisprudence by § 537.600, which neither defines nor enlarges the perimeters of sovereign immunity, leaving to the courts the traditional function of determining the common law. Our courts are perfectly capable of deciding what the common law is, or was at a point in time, even in the absence of decisional authority. *See, Lambing v. Southland Corporation,* 739 S.W.2d 717 (Mo. banc 1987).

It follows that the preliminary rule should be made absolute, so that the trial judge is prohibited from limiting the plaintiff's possible recovery to $100,000.